UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SHONDELL KILLEBREW,

                          Plaintiff,

v.                                        Case No. 23-cv-677-pp

HEATHER RIEHLE VOGEL
and MARQUELEANA MORIARTRY,

                          Defendants.

---

## ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), SCREENING COMPLAINT UNDER 28 U.S.C. §1915A AND DISMISSING CASE

---

      Shondell Killebrew, who is incarcerated at the Wisconsin Resource Center and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, and screens his complaint, dkt. no. 1.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

      The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

1

On June 21, 2023, the court ordered the plaintiff to pay an initial partial filing fee of $0.42. Dkt. No. 6. The court received $1.00 from the plaintiff on August 8, 2023. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay remainder of the filing fee over time in the manner explained at the end of this order.

## II. Screening the Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

2

Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  The Plaintiff's Allegations

The plaintiff alleges that on February 16, 2023, defendant Marqueleana Moriartry, his parole agent, and defendant Heather Riehle Vogel, Moriartry's supervisor, were "going to pursue the revocation of [his] supervision after they neglect[ed] to acquire evidence that was favorable to the plaintiff therefore committing a Brady violation." Dkt. No. 1 at 3-4. The plaintiff alleges:

> Now because [he] was subject[ed] to injustice of consciously knowing that he did nothing wrong but defuse the situation from becoming hostile and harboring confusion about why the defendant [] Moriartry neglect[ed] to acquire evidence that was favorable to him, and defendant [] Riehle Vogel signing everything without questioning Moriartry of obtaining evidence the plaintiff referred to in his statement did cause him to become afraid of facing the

3

>Administrative Law Judge and compelled the plaintiff to waive his hearing[.]

Id. at 4-5.

The complaint describes in detail the events leading up to the plaintiff's revocation; the court summarizes those facts here. The plaintiff alleges that on October 16, 2022, he told his girlfriend that he was "breaking it off with her and because she noticed an explicit picture of another woman['s] genitalia in [his] phone," she become irate, jumped out of his truck and went toward her stepson's apartment building. Id. at 5-6. The plaintiff states that he left, picked up his "female friend" and returned to his apartment where his ex-girlfriend and her stepson were outside. Id. at 6. The plaintiff's ex-girlfriend allegedly began yelling at the plaintiff and his female friend tried to jump out of truck to fight with his ex-girlfriend. Id. He says that while he tried to stop his friend from getting out, his ex-girlfriend came to his door, grabbed his hood and started pulling him. Id. at 6-7. The plaintiff alleges that his female friend got out of his truck and then he got out to stop her before she got to his ex-girlfriend. Id. at 7. He says that he shoved his female friend back in his truck. Id. As the plaintiff walked back to get in the truck, his ex-girlfriend allegedly pulled him and scratched his face. Id. The plaintiff says he was able to get back in the truck, and he and his friend drove away. Id.

The plaintiff alleges that his friend thought she dropped her phone, so they drove back to get it, although they realized it was still in the truck before they got out of the truck. Id. As they were about to drive away, the plaintiff allegedly saw his ex-girlfriend standing by the window, so he rolled down the

4

window to talk to her; while doing that, he saw a car pull up and "a lot of people" got out of the car. Id. at 7-8. The plaintiff states that he immediately got out and yelled that he was calling the police, so they all got back in their car and left. Id. at 8.

The plaintiff alleges that the next day, he called his sister and told her what happened and asked her to meet him at his agent's office so he could report it. Id. He says that while he and his female friend were driving to his agent's office, his ex-girlfriend's daughter called him and said that she and her mother were at the plaintiff's apartment smashing out his windows. Id. The plaintiff states that he headed back to his apartment and called the police. Id. When the plaintiff arrived at his apartment, he allegedly saw that the Milwaukee Fire Department had just finished "administering medical" to his ex-girlfriend. Id. The plaintiff alleges that when he asked her if she was okay, she grabbed his hood and tried to scratch him. Id. at 8-9. The plaintiff states that he slowly pulled away and parked and waited for the police to arrive. Id. at 9. When law enforcement arrived, one officer asked to speak to the plaintiff and another officer spoke with his ex-girlfriend. Id. The plaintiff's sister allegedly arrived. Id. The plaintiff states that an officer asked him if he had medication that belonged to his ex-girlfriend, which he did, and he and the officer retrieved it from his apartment. Id. The plaintiff says that after the incident, he, his sister and his female friend went to his agent's office where he was taken into custody. Id. at 9-10.

5

The plaintiff claims that the defendants failed to obtain evidence that was favorable to him, which was a "Brady violation," because of the Department of Community Corrections' (DCC) "unconstitutional 'Hearsay Admissible' policy." Id. at 10-11. According to the plaintiff,

> [I]f a client is believed to have violated their rules of supervision then it requires the client's agent to conduct an investigation as stated in the D.C.C.'s Evidence-Based Response to Violations (hereinafter E.B.R.V.) that states[,] "When an agent discovers evidence of possible violations of supervision by his/her client the agent 'must' investigate the facts underlining the alleged violations,["] it then goes on to state that "an agent's investigation 'should' be thorough, objective and well documented,["] as well as state, "it is particularly important that an agent 'seek' to uncover all aspects of the alleged violations."
>
> …
>
> However, because of the unconstitutional 'Hearsay Admissible' policy … that basically informs an agent that if they can obtain a statement of possible violation(s) which is offered as proof of the truth of the matter asserted[,] then[] the agent can relax in trying to obtain evidence because the statement(s) is admissible at final revocation hearing, so it makes an agent disregard following their rules/procedures of the E.B.R.V of conducting a comprehensive investigation that state "a comprehensive investigation is necessary to ensure that a client is not unjustifiably deprived of their rights or their freedom."

Id. at 11-12. The plaintiff claims that the DCC may be held liable for a constitutional violation if an official policy or conduct that can fairly be described as DCC's policy directly caused the violation. Id. at 12.

The plaintiff alleges that on November 3, 2022, Moriartry and other agents searched his apartment and no "firearm/weapon/ammunition" was found. Id. Moriartry also allegedly searched the recordings of the plaintiff's calls at Milwaukee Secure Detention Facility to gather information pertaining to

a firearm, but no information was found. Id. at 13. The plaintiff states that he "can guarantee that Moriartry heard the same female friend state numerous times in different call recordings that [he] did not do anything but stopped her several times from kicking [his] ex's (A**) so Moriartry did omit facts she knew would negate probable cause to pursue revocation of [his] supervision." Id. The plaintiff states that if Moriartry had conducted further investigations, she would have obtained evidence to negate probable cause to pursue the revocation of his supervision. Id. at 13-15.

For relief, the plaintiff asks the court to reinstate his previous maximum discharge date of February 19, 2023. Id. at 18. He also seeks monetary damages. Id. at 18-20. The plaintiff asserts that the DCC's unconstitutional "Hearsay Admissible policy" should be discarded and replaced with "hearsay statement only admissible if accompanied with a non-coerce[d] hospital and/or police report (dated no longer than a week) of the incident[.]" Id. at 20-21.

C. Analysis

The plaintiff argues that his revocation was unconstitutional because DCC policy allowed his agent to commence revocation proceedings without conducting a thorough investigation which compelled him to waive his revocation hearing because he feared facing the Administrative Law Judge.[1] He appears to argue that if a thorough investigation had been conducted, the defendants would not have had sufficient evidence to pursue revocation of his

---

[1] Under Wisconsin law, an individual on probation or parole is entitled to a final revocation hearing within fifty days after being detained, unless the individual has waived his right to that hearing. Wis. Stat. §302.335(2)(b).

7

Case 2:23-cv-00677-PP   Filed 12/12/23   Page 7 of 11   Document 15

supervision. Dkt. No. 1 at 13. The plaintiff challenges the validity of his revocation and seeks reinstatement of his prior maximum discharge date (February 19, 2023).

To the extent the plaintiff requests reinstatement of his maximum discharge date of February 19, 2023, his claim is barred because that relief is available only through petition for a writ of *habeas corpus*. See Wilkinson v. Dotson, 544 U.S. 74, 78, 81-82 (2005) (citing Preiser v. Rodriguez, 411 U.S. 475, 489 (1973) (An incarcerated individual in state custody cannot use a §1983 action to challenge "the fact or duration of his confinement.")).

The plaintiff also seeks damages and asks that the court "discard" the DCC's "Hearsay Admissible policy." This court must ask whether, if it rules in the plaintiff's favor, that ruling "would necessarily imply the invalidity of his conviction or sentence." Heck v. Humphrey, 512 U.S. 477, 487 (1994). If it would, then this court must dismiss his §1983 complaint. That is because §1983 allows people to sue for certain, specific kinds of "torts"—personal injuries. Id. at 483 (citations omitted). The Supreme Court has held that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . .." Id. at 485.

The plaintiff has not asked the court to order the revocation hearing that he says he was compelled to waive. He contends that the defendants would not have had sufficient evidence to start revocation proceedings against him if they had conducted a thorough investigation. If the court ruled in the plaintiff's favor, it would effectively deem the commencement of the revocation

8

proceedings unlawful. He is challenging the validity of the revocation of his supervision. A judgment in the plaintiff's favor on his request for damages and declaratory relief necessarily would imply the invalidity of his confinement. Cf. Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) (incarcerated individuals who challenged state's parole procedures could bring §1983 claims because success in their favor did not mean immediate release from confinement or a shorter stay in prison, rather it meant at most new parole eligibility review).

The plaintiff has two options available to him if he wants to challenge the validity, or legality, of his revocation. First, even though he waived his revocation hearing, the plaintiff may be able to appeal the revocation and sentence through the state court system. Second, an individual who wants to challenge the "validity of [his] confinement" may do so by filing a petition for a writ of *habeas corpus* under 28 U.S.C. §2254. Hill v. McDonough, 547 U.S. 573, 579 (2006) (quoting Muhammad v. Close, 540 U.S. 749, 750 (2004)).

The court will dismiss the plaintiff's complaint without prejudice. Once he has exhausted applicable state court remedies (such as appeal), the plaintiff can decide whether he wants to file a federal *habeas* petition under §2254 or a claim for money damages under §1983. If the plaintiff decides to file a federal *habeas* petition, he will have to demonstrate that he has "exhausted" his remedies, and he must make sure that he timely files his petition under 28 U.S.C. §2244(d). The court will mail the plaintiff a guide, "Habeas Corpus: Answers to State Petitioners' Common Questions," along with this order.

9

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **ORDERS** that this case is **DISMISSED** without prejudice. The court will enter judgment accordingly.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$349** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Wisconsin Resource Center, where the plaintiff is confined.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule

of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $505 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12 day of December, 2023.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

11